In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3894

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN WYSINGER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 09-CR-30159-MJR—**Michael J. Reagan,** *Judge.*

ARGUED SEPTEMBER 8, 2011—DECIDED JUNE 22, 2012

Before MANION, ROVNER and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted John Wysinger on one count of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 851; and one count of aiding and abetting possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 851, and 18 U.S.C. § 2. At trial, the jury twice viewed a video of Wysinger's interrogation by an agent of the Drug

Enforcement Agency ("DEA"). Wysinger challenged the admission of the video on the grounds that the *Miranda* warning was inadequate and misleading, and that the agent continued to interrogate him after he clearly and unequivocally invoked his right to counsel. On appeal, he again challenges the admission of the video. We agree that the video should have been suppressed and that the error was not harmless. Accordingly, we vacate Wysinger's conviction and remand for further proceedings.

## I.

Wysinger came to the attention of the DEA as the result of an investigation into a drug trafficking operation between East St. Louis, Illinois, and Chicago. The investigation began when a confidential informant told the DEA that Sebastion Robinson, an East St. Louis resident, was distributing drugs. The DEA began to surveil Robinson's residence. On December 15, 2008, agents followed two vans leaving Robinson's residence. At the direction of the DEA, local police officers stopped the vans. One of the vans was driven by Tryd Wysinger, John Wysinger's brother.[1] The agents seized approximately $54,000 in cash from a small backpack found in the van. Other

---

[1] For the sake of clarity, we will refer to the defendant as "Wysinger" and to his brother as "Tryd." At trial, Wysinger challenged DEA Special Agent Mike Rehg's identification of his voice on various phone calls involving a person named "John" or "Cool." When discussing the challenged phone calls, we will use those names.

passengers in the van included Rajdel Laurence, a woman and a child. The adult passengers in the van claimed ignorance about the ownership of the money and how it came to be in the van. Within the next ten days, a person purporting to be John Wysinger left a telephone message for DEA Special Agent Mike Rehg regarding the $54,000. Agent Rehg returned the call after the holidays and recorded the conversation. A person answering to the name "John" told Agent Rehg that he placed the money in the van and that none of the occupants knew it was there. He explained that he borrowed $45,000 from his boss and that he and his fiancée contributed $10,000 more. The money was to be used to rehab his mother's house. John identified the other occupants of the van as his brother (Tryd), his cousin (Rajdel Laurence), his grandmother and his son. He told the agent that he did not want them to know that the money was in the van, and planned to tell his mother to retrieve the money once the van arrived at her home in Texas. John and Agent Rehg briefly discussed what would happen next to the money before the call ended.

After a confidential informant purchased crack cocaine from Sebastion Robinson in February 2009, law enforcement officials arrested Robinson and searched his home. The DEA recovered $35,000 in cash, two firearms, and small amounts of cocaine and marijuana from Robinson's home. Robinson subsequently agreed to cooperate with the DEA in its investigation. Robinson told Agent Rehg that he obtained cocaine from Wysinger (whom Robinson knew by the nickname "Cool") in Chicago, sold it in the East St. Louis area, and then paid Wysinger

from the proceeds. Robinson said that he and Keith Holmes, another East St. Louis dealer, each owed Wysinger approximately $21,000 and that the money seized from Robinson's home belonged to Wysinger. After providing Robinson with recording equipment, Agent Rehg asked Robinson to arrange a meeting with Holmes to deliver $42,000 to Dempsey Ivery, a courier believed to be working for Wysinger. Law enforcement officers then stopped the car on the way to the meeting and seized the money.

After these large seizures of cash by police officers, contact among Wysinger, Robinson, Holmes and other participants slowed for several months as they became concerned about the apparent investigation. In May 2009, the group began talking again. Robinson met with Tryd and determined that Wysinger was ready to arrange another cocaine delivery to the East St. Louis area. On May 26, 2009, the DEA asked Robinson to call Wysinger to see if any cocaine was available. The DEA recorded the call. Agent Rehg interpreted the cryptic conversation as Wysinger telling Robinson that he was trying to obtain some cocaine and would let Robinson know when he was able to do so. Robinson confirmed that interpretation in his own testimony at trial. The next day, Robinson told Agent Rehg that Wysinger and Tryd had contacted him to report that a shipment was on its way to East St. Louis and would be there within hours. After establishing surveillance at Robinson's home, officers were able to identify a van occupied by Tryd and an unidentified woman. Local officers stopped the van and discovered a kilogram of

cocaine. Tryd and the woman were taken to the police station for questioning. Two agents then met with Robinson so that any subsequent calls with Wysinger could be recorded.

The agents recorded three short calls between Robinson and Wysinger on May 27, each interpreted by Agent Rehg and Robinson at trial. In the first call, Wysinger asked if Robinson had received the shipment and Robinson said he had not. Wysinger also asked how much money Robinson would be giving Tryd on delivery and Robinson indicated $4000. In the second call, Wysinger asked again (in coded language) if the cocaine had been delivered and Robinson indicated it had not. Robinson then asked if it was in a white van and indicated that local police had stopped a white van a short distance from his home. Robinson told Wysinger he would drive past the scene to see if it was Tryd's van. In the third call, the two continued to discuss the traffic stop of the van.

When agents on the scene saw that the van came from the direction of Holmes' house, they decided to see if the van had first delivered cocaine to Holmes. They found Holmes standing on the street a half a block from the van watching the police investigation. After being arrested, Holmes agreed to cooperate with authorities. As the agents talked to him, Holmes' phone began ringing. Holmes indicated that Wysinger was calling and that he needed to answer. The officers allowed him to answer the phone and recorded the call. Holmes and Wysinger spoke about the stop of the van. After the call, Holmes

consented to a search of his house and police officers recovered a half kilogram of cocaine that Holmes admitted had just been delivered by Tryd.

The next morning, agents recorded another phone call between Holmes and Wysinger. Wysinger sought Holmes' advice on lawyers he could hire to represent Tryd. A few days later, the agents arranged for Holmes to call Wysinger again, in order to begin to explain to him that he would not be able to pay for the half-kilogram of cocaine that had been seized from his home. Holmes told Wysinger that agents had seized the cocaine from a house where he stored it. Wysinger wanted to visit the house himself, and so the agents allowed Holmes to set up a meeting with Wysinger. Wysinger met Holmes in a liquor store parking lot and transferred to Holmes' truck. The agents later stopped Holmes' truck and arrested Wysinger. The agents also arrested Rajdel Laurence, who was in the vehicle in which Wysinger had arrived. All were transported to the East St. Louis police department.

On June 1, 2009, Wysinger was interrogated by Agent Rehg and Wade Gummersheimer, a Fairview Heights police officer who worked on a DEA task force. The video recording of the interrogation was played twice for the jury during Wysinger's trial, once during the government's case-in-chief, and once during delibera- tions at the request of the jury. The interrogation took

place in a small, uncomfortably warm[2] room containing a rectangular table, three chairs and a wall clock. The table was small enough that adults sitting on opposite sides would likely bump knees if they pulled their chairs up to it. The microphone recording the interrogation is not visible on the video. Agents Rehg and Gummersheimer entered the room together and a brief discussion ensued over which cell phone in a plastic bag belonged to Wysinger. A handcuffed Wysinger, who was seated alone in the room before the officers arrived, pointed out his phone without hesitation.

Agent Rehg then briefly took a call on his own cell phone, and as soon as he hung up, Wysinger said, "Do I need a lawyer before we start talking?" Video at 12:54; R. 287, Tr. at 104.[3] Agent Rehg replied, "Well, we're going

---

[2] During a break when the agents were out of the room and Wysinger was alone, he exclaimed, "Shit! It's hot in this motherfucker!" Video at 13:26. Wysinger appeared unaware that the meeting and the break were being videotaped. In the opening moments of the video, Officer Gummersheimer can be seen wiping sweat from his forehead with his shirt sleeves. Video at 12:54.

[3] All citations to the videotaped interrogation are to the time index displayed on the video, which was Exhibit 21 at trial. When the video was played for the jury during the trial, the court reporter attempted to transcribe the conversation, and we will occasionally cite to the trial transcript as well. Because of issues with the sound quality, many parts of the video are difficult to hear, and the trial transcript has many

(continued...)

to talk about that." Video at 12:54. He then introduced himself and Officer Gummersheimer and told Wysinger, "Make no bones about it. You're under arrest. I mean, make no bones about it." Video at 12:54; R. 287, Tr. at 104. After a brief interlude where Wysinger complained about the timing of his arrest, Agent Rehg began to read Wysinger his *Miranda* rights from a card that the agent pulled from his wallet. About half way through the reading, the agent began to scratch the back of his neck. When he reached the words, "If you can't afford a lawyer, one will be appointed for you before we ask any questions. Do you understand . . . ," Agent Rehg slapped the table loudly, startling Wysinger. Video at 12:55; R. 287, Tr. at 105. The agent said that he had felt something crawling on his neck. In response to Rehg's questions, Wysinger said he had previously been arrested for "petty shit," that he did not have a high school or college education, but that he understood his rights.

Agent Rehg then began to describe to Wysinger what the agents already knew about the flow of money and cocaine between Chicago, East St. Louis and Texas. In response to Agent Rehg's comments, Wysinger indicated

---

[3] (...continued)

indications of "inaudible." With a few careful reviews of the tape, we have been able to fill in some of the parts that were inaudible to the court reporter during the trial. In all relevant respects, our version of the taped interrogation is fully consistent with the district court's findings regarding what was said during the interrogation.

that he knew the police were watching him and had stopped people he knew, and he surmised that "Keith," presumably Keith Holmes, had been working with the police. After Agent Rehg told him that one of his associates lost $20,000 during a police stop in Texas, Wysinger grew impatient and said, "Get straight to the point, Mike. I just don't want to get fucked in the deal. You know what I'm saying?" Video at 12:58; R. 287, Tr. at 107. Agent Rehg then explained that Wysinger could cooperate or be charged with conspiracy to distribute cocaine. After denying personal involvement, Wysinger then asked if Agent Rehg could help his brother, Tryd. Agent Rehg indicated that the United States Attorney might be amenable to helping Tryd in exchange for Wysinger's cooperation. Agent Rehg said he could not make any guarantees, that charges would not be dropped but that Wysinger could get a sentencing break for himself and his brother if he cooperated. Although much of what Wysinger said next was garbled, part of his statement was clear:

> There's a whole lot of motherfuckers in Texas I do not like. You know what I'm saying? And I tell motherfuckers, in this game, you don't fuck with those people, 'cause you make enemies. You know what I'm saying? You always keep the motherfucker happy if you doing this type of shit, 'cause the motherfucker come back to haunt you. You know what I'm saying?

Video at 13:00; R. 287, Tr. at 109. Agent Rehg then explained that, if Wysinger wished to cooperate, he would have to tell the agents what he had been doing,

that Agent Rehg would then speak to the U.S. Attorney to determine whether Wysinger would be released that day.

Wysinger again expressed dissatisfaction that his brother had been arrested and Agent Rehg said that he could not agree to release Tryd, and that the bond decision was up to the judge. Wysinger told Agent Rehg that he needed to arrange the release of his brother more than he needed to be released himself. The following exchange then occurred:

> Rehg: Well, tell us what has been going on. Maybe that's the best way to start.
>
> Wysinger: I mean, do you think I should have a lawyer? At this point?
>
> Rehg: That is up to you. . . . I read you your rights. If you want an attorney, by all means, get one. Ok?
>
> Wysinger: I mean, but can I call one now? That's what I'm saying.
>
> Rehg: Who you gonna call?
>
> Wysinger: I got a, um, I had a number inside of the van, inside the green van on a sheet of paper. I had the attorney's name.
>
> Gummersheimer: What's his name? Do you know it?
>
> Wysinger: I can't think of the name. I just had it wrote down.
>
> Rehg: Is he local?
>
> Wysinger: Yeah. He's in Belleville.
>
> Rehg: What's his name? I might know him.

Video at 13:03; R. 287, Tr. at 111. This exchange
continued for some time before Agent Rehg asked, "Can
we go look in the van?" Wysinger assented and Agent
Rehg asked, "Is there any dope or money in there?" Video
at 13:04; R. 287, Tr. at 112. That question prompted a
denial and an explanation of why Wysinger was in the
East St. Louis area, namely, to get a lawyer for his
brother and to retrieve a rental van seized by police so
that the van could be returned and stop accumulating
rental charges. Agent Rehg disputed the truth of this
explanation and after a brief diversion, the topic
returned to Wysinger's request for an attorney:

> Rehg: We'll go out in the van and get that number
> if you want an attorney. If you don't, we can get the
> thing going so we know where you are at. It's up
> to you.
>
> Wysinger: I just don't want to cross no lines, and then,
> you know what I'm saying, regret shit. I mean, I want
> to work with you. You know what I'm saying?
>
> Gummersheimer: What is the attorney's phone num-
> ber? Do you have any idea?

Video at 13:06; R. 287, Tr. at 113-14. Wysinger again
struggled to remember the number and to describe the
paper in the van containing the number. Agent Rehg then
asked Wysinger if the attorney Wysinger intended to
call was his brother's lawyer, and told Wysinger that he
was "not going to be allowed to have the same attorney"

as his brother.[4] Video at 13:06; R. 287, Tr. at 114. After a brief discussion of whether the attorney had already been retained or paid, Agent Rehg asked, "You want us to look for it?" and Wysinger said, "Yeah, go get it for me, Mike. I'm going to call this attorney, get his advice. I was on my way to see him but I didn't know how to get over there." Video at 13:07; R. 287, Tr. at 115.

Agents Rehg and Gummersheimer left the room and came back with a paper they retrieved from the van. Agent Rehg asked, "Do you mind if I call and hand the phone to you?" and Wysinger replied, "Yeah." Video at 13:12; R. 287, Tr. at 115. Agent Rehg then used his own cell phone to call the lawyer. Rather than hand the phone over, he first engaged the lawyer in conversation for a few minutes, giving him "background" about Wysinger's arrest, and discussing a cocaine conspiracy involving persons in Texas, Chicago and East St. Louis. Agent Rehg told the attorney that Wysinger was the main target of the investigation. Eventually, he handed the phone to Wysinger. Agents Rehg and Gummersheimer stayed in the room while Wysinger spoke to the lawyer, sitting no more than a few feet away, able to hear every word Wysinger said. The video- and audio-taping continued as Wysinger had a very brief discussion with the lawyer. At one point, Wysinger was ap-

---

[4] Agent Rehg's advice was incorrect. A lawyer may represent two clients even if those clients have conflicting interests so long as both clients consent to the representation and so long as the lawyer meets the requirements of Rules 1.7 and 1.8 of the Illinois Rules of Professional Conduct.

parently on hold with the lawyer and engaged in a brief conversation with Agent Rehg about their first phone call, when Wysinger called Agent Rehg to discuss the seized money shortly before Christmas when Agent Rehg was on vacation. After completing a very brief conversation with the lawyer, Wysinger handed the phone back to Agent Rehg, who continued talking to the attorney about Wysinger's possible cooperation.

When Agent Rehg hung up the phone, he told Wysinger that he would attempt to arrange for Wysinger to get access to part of the seized funds in order to pay the attorney if Wysinger was interested in cooperating. Because the attorney was not able to meet with the agents until Friday (the interrogation took place on a Monday), Wysinger would have to drive back to East St. Louis later that week. Wysinger was irritated by this turn of events and complained that he did not "need this headache," that he had ten children and was tired and under stress. He told Agent Rehg, "I am wore out. I'm tired. This is stressful. The economy is fucked up, you know what I'm saying? What can a black man do nowadays?" Video at 13:21; R. 287, Tr. at 118. Agent Rehg told Wysinger that many people were struggling and had choices to make.

Agent Rehg then decided to give Wysinger "some advice," emphasizing that he was not asking questions because Wysinger had asked for an attorney. Video at 13:21-13:22; R. 287, Tr. at 118. Agent Rehg told Wysinger that if he was serious about cooperating he should not talk to anyone in East St. Louis except his lawyer. He

specifically warned Wysinger, "Don't be talking to any-body else, any of the guys that we're talking to." Video at 13:22; R. 287, Tr. at 119. At this reference to persons who were already cooperating with the police, Wysinger again showed irritation, and although the first part of his response was unintelligible, the last part was clear: "fuck around and hurt somebody." Video at 13:22; R. 287, Tr. at 119. Agent Rehg clearly heard this as a threat to cooperating witnesses and immediately warned Wysinger that he would be "locked up" if the agents heard about any such threats. After asking Wysinger about his prior criminal record, Agent Rehg again warned him that if he heard "any other bullshit going on out there" they would arrest Wysinger again. Video at 13:22-13:23; R. 287, Tr. at 119. Agent Rehg em-phasized that things are not always as they appear and that there were many ways the agents obtained the in-formation that led to Wysinger's arrest that day. They again talked about a lawyer Wysinger wished to hire for his brother, and Wysinger expressed more concern over his brother's arrest because Tryd had recently been released from prison after serving a sixteen-year sen-tence. He indicated that people were asking where his brother was and that he was telling them that he was "on vacation." Video at 13:23; R. 287, Tr. at 120.

The entire tape was shown to the jury twice,[5] once during the government's case-in-chief and once during

---

[5] A few short clips were shown to the jury again during the government's case-in-chief, immediately after the full video was played.

deliberations at the request of the jury. The jury also requested to hear the tape of the initial call with Agent Rehg regarding the $54,000 seized from Tryd's van in December 2008. During the case-in-chief and closing arguments, the government repeatedly emphasized several of the more incriminating statements Wysinger made during the interrogation. In addition to Agent Rehg's testimony and the videotape of the interrogation, the main evidence against Wysinger consisted of the testimony of cooperating co-conspirators who had struck favorable deals with the government in exchange for their testimony, and recorded calls with those co-conspirators. No money or drugs were ever seized from Wysinger and the police never connected any of the phones used in the recorded calls to Wysinger. Instead, Wysinger's participation in those calls was established by the testimony of cooperating co-conspirators and by Agent Rehg's identification of Wysinger's voice.

Wysinger moved to suppress the videotaped interrogation before trial. He contended that he was not properly apprised of his *Miranda* rights, that the agents attempted to divert him from exercising his rights, that he did not waive those rights, and that questioning improperly continued after he repeatedly asked for a lawyer. The district court rejected all of Wysinger's arguments. The court first found that Agent Rehg clearly read Wysinger his *Miranda* rights at the start of the interview. The court held that Wysinger waived those rights implicitly when he indicated that he understood his rights and then offered an uncoerced statement.

Finally, the court concluded that each mention of an attorney by Wysinger failed to meet the standard for a clear and unambiguous invocation of the right to an attorney. As we noted above, the jury viewed the entire interrogation twice before convicting Wysinger on both counts charged in the indictment. Wysinger appeals.

## II.

On appeal, Wysinger again challenges the admission of the videotaped interrogation. He first contends that the court erred in admitting the video because he clearly and unambiguously invoked his right to counsel multiple times. He next argues that the statements he made to Agent Rehg and Officer Gummersheimer were obtained as the result of inadequate and misleading *Miranda* warnings. Finally, he contends that the court should not have admitted the portions of the video containing his privileged communications with his lawyer. In considering a district court's decision on a motion to suppress, we review findings of fact for clear error and questions of law *de novo*. *United States v. Peters*, 435 F.3d 746, 750 (7th Cir. 2006).

## A.

We begin with Wysinger's claim that the district court erred in refusing to suppress the video on the ground that the agents continued to interrogate him after he clearly invoked his right to counsel multiple times.

There are no real disputes regarding the facts. The parties do not disagree in any material way about the words that Wysinger spoke when he referenced his right to an attorney. Instead, they take issue with the legal effect of those words, and that is a question of law. *Peters*, 435 F.3d at 750.

In *Miranda*, the Supreme Court held that, when an individual in custody "states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). The Supreme Court later clarified:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The government does not dispute that Wysinger was in custody, the first part of the *Miranda* analysis. The rule expressed in *Miranda* and *Edwards* next requires courts to engage in two distinct inquiries. First, courts must determine whether the suspect actually invoked his or her right to counsel. "Second, if the accused invoked his right to

counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citing *Edwards*, 451 U.S. at 485, 486, n. 9).

The question here is whether and when Wysinger "actually invoked" his right to counsel. "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." *Davis v. United States*, 512 U.S. 452, 458-59 (1994). In order for the protections of *Miranda* and *Edwards* to apply, the suspect must, at a minimum, make a "statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). *See also Davis*, 512 U.S. at 459 (same). If a suspect makes an equivocal or ambiguous reference to a lawyer, a reference that a reasonable officer would interpret as a statement that the suspect *might* be invoking the right to counsel, there is no requirement that questioning end. *Davis*, 512 U.S. at 459. In determining whether a suspect clearly invoked his or her right to counsel, we consider the circumstances in which the statement was made as well as the words employed. *United States v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 3384 (2010). *See also United States v. Hampton*, 675 F.3d 720, 727 (7th Cir. 2012) (objective inquiry into whether suspect invoked right to counsel includes review of not only the words the

suspect used but also the circumstances in which the statement was made).

> [T]he suspect must unambiguously request counsel. As we have observed, a statement either is such an assertion of the right to counsel or it is not. . . . Although a suspect need not speak with the discrimination of an Oxford don . . . he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Davis*, 512 U.S. at 459 (internal quotation marks and citations omitted).

In *Smith*, the suspect was told he had the right to consult with a lawyer and to have a lawyer present when being questioned. When the officer immediately followed this part of the *Miranda* warning by asking, "Do you understand that?" the suspect replied, "Uh, yeah. I'd like to do that." 469 U.S. at 93. Although the suspect then wavered regarding his desire to have a lawyer after the officer completed the full *Miranda* warning, the Supreme Court held that the later equivocation could not render ambiguous the earlier clear and unequivocal invocation of the right to counsel. *Smith*, 469 U.S. at 95-98. Similarly, in *Edwards*, the state supreme court determined that the defendant's statement, "I want an attorney before making a deal," was sufficiently clear within the context of the interrogation to constitute a

request for counsel. *Edwards*, 451 U.S. at 480 n.6. On the other hand, the statement, "Maybe I should talk to a lawyer," is not a clear request for counsel. *Davis*, 512 U.S. at 462. *See also Shabaz*, 579 F.3d at 818-19 (the question "[A]m I going to be able to get an attorney?" posed before *Miranda* warnings is not a clear request to consult with counsel presently); *United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) ("Can I have a lawyer?" is an unequivocal request for an attorney, requiring that police officers halt the interrogation; "I think I should call my lawyer," "Can I talk to a lawyer?" and "I have to get me a good lawyer, man. Can I make a phone call?" are also all unequivocal invocations of the right to counsel); *United States v. Lord*, 29 F.3d 1216, 1221 (7th Cir. 1994) (the question, "I can't afford a lawyer but is there any way I can get one?" lacked the clear implication of a present desire to consult with counsel and thus was not an unequivocal request for counsel).

Wysinger contends that he first invoked his right to counsel in the opening moments of the interrogation, when he asked "Do I need a lawyer before we start talking?" Video at 12:54; R. 287, Tr. at 104. Wysinger argues that this question indicated an intention to have a lawyer present at that moment, *before* the interrogation began. In context, Wysinger asked this question before receiving a *Miranda* warning. Agent Rehg responded, "Well, we're going to talk about that." He then gave a *Miranda* warning that we will discuss below and engaged Wysinger in a conversation that meets the def-

inition of interrogation.[6] In this context, a reasonable officer might not understand Wysinger's initial reference to an attorney as an unequivocal request for a lawyer. True, Wysinger's question mentioned the present moment, *i.e.*, "before we start talking." But asking "Do I need a lawyer?" is a substantively different question than "Can I have a lawyer?" *See Lee*, 413 F.3d at 626 ("Can I have a lawyer?" is an unequivocal request for an attorney). The first question indicates that the asker is contemplating whether he is in need of the services of a lawyer; the second question is a direct request for a lawyer. *See also Mueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir. 1999) (question "Do you think I need an attorney here?" posed to police officer during interrogation was an ambiguous "query whether his interrogator thought that counsel might be helpful" and not "a clear assertion of his right to counsel"); *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996) (question "Do you think I need a lawyer?" not a clear invocation of the right to counsel); *United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994) (a suspect asking if he "should see a lawyer" has not clearly invoked his right to counsel); *United States v. March*, 999 F.2d 456, 460 (10th Cir. 1993) (defendant's question "Do you think I need an attor-

---

[6] The *Miranda* safeguards apply not only to express questioning but to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

ney?" did not constitute an unequivocal request for an attorney). Wysinger's initial question thus was not an unequivocal request for a lawyer and Agent Rehg was not required to cease the interrogation at that point. As we have done before, though, we encourage law enforcement officers to heed the Supreme Court's suggestion in *Davis* that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Lee*, 413 F.3d at 626-27 (quoting *Davis*, 512 U.S. at 461). That clarification can aid both the police officers and the reviewing courts. *Lee*, 413 F.3d at 626-27. *But see Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259-60 (2010) (if a suspect makes an ambiguous or equivocal statement concerning counsel, police are not required to end the interrogation or ask questions clarifying whether the accused wishes to invoke his or her *Miranda* rights).

That first, ambiguous question by Wysinger came at time index 12:54 in the video. Wysinger's next reference to a lawyer occurred at time index 13:03, after approximately nine minutes of interrogation. At that point, Agent Rehg opened his notebook, pulled out his pen, and asked Wysinger to "tell us what has been going on." Wysinger then made his second reference to counsel, saying, "I mean, do you think I should have a lawyer? At this point?" Video at 13:03; R. 287, Tr. at 111. Agent Rehg responded that it was up to him, that if he wanted an attorney, he should get one. Wysinger's second question was virtually identical to his initial, ambiguous inquiry. In and of itself, it does not constitute an

unequivocal request for counsel. As is apparent from Agent Rehg's response, he heard Wysinger's question as just that, a question seeking the agent's opinion.

But Wysinger's very next sentence clarified the request and removed all doubt as to his meaning. After Agent Rehg told him, "If you want an attorney, by all means, get one," Wysinger responded, "I mean, but can I call one now? That's what I'm saying." Video at 13:03; R. 287, Tr. at 111. That response to Agent Rehg's statement, in context, was an unequivocal request for counsel that no reasonable officer could interpret other-wise. The government asserts that this question could have been asked to determine whether Wysinger would still be eligible for cooperation if he called an attorney. But that is a strained and unnatural reading of Wysinger's question. Agent Rehg had just flipped open his notebook and asked directly (for the first time) for Wysinger to tell the officers "what has been going on." Wysinger asked if the agent thought he should have a lawyer at that point, and when the agent told him it was up to him, he asked to "call one now." In context, the gov-ernment's suggested meaning makes no sense.

The interrogation should have immediately ceased at that point. Instead, Agent Rehg continued to make state-ments and ask questions that a reasonable officer would know were likely to elicit incriminating responses. For example, within seconds, Agent Rehg asked if there was "any dope or money" in Wysinger's van. And in the ensuing minutes, Agent Rehg challenged the truth of Wysinger's explanation for why he was in the East

St. Louis area, reminded Wysinger that the police had intercepted phones calls, and told Wysinger that he was familiar with other persons in Wysinger's circle. The court should have excluded everything on the video from the invocation of the right to counsel at time index 13:03 through the end of the interrogation at 13:26 on the grounds that the additional twenty-three minutes of interrogation violated *Miranda* and its progeny.[7]

**B.**

Our conclusion that the court should have suppressed any interrogation that occurred after Wysinger invoked his right to counsel at time index 13:03 does not address the first nine minutes of the video, which Wysinger also sought to exclude. We therefore must consider Wysinger's alternate argument that the entire video should have been suppressed because his statements were obtained as the result of an inadequate and misleading *Miranda* warning. In particular, Wysinger complains that the *Miranda* warning misled him into believing that his right to counsel applied only to "questioning" and that Agent Rehg then engaged in a course of conduct designed to divert Wysinger away from in-

---

[7] Although the agents later allowed Wysinger to call an attorney, an isolated consultation with an attorney who is not physically present is inadequate under *Edwards* and its progeny to protect a suspect's rights. *See Minnick v. Mississippi*, 498 U.S. 146, 154 (1990).

voking his rights by implying that questioning had not yet begun. We will first address the adequacy of the *Miranda* warning Agent Rehg delivered, and we will then turn to whether Wysinger was misled and diverted by the warning and the agents' course of conduct.

**1.**

The government contends that Wysinger waived his challenge to the adequacy of the *Miranda* warning by not preserving the issue below. But Wysinger did in fact raise this argument in his pretrial motion to suppress in the district court, and the court addressed it on the merits. R. 101 (Motion to Suppress Video and Taped Statements). In that motion, he complained that, after he requested a lawyer, the DEA agents "proceed[ed] to direct the conversation away from the defendant's request for a lawyer" and continued the interrogation. He also asserted that he "was not properly advised of his rights to consult a lawyer and to have a lawyer present [with] him during the interrogation." Wysinger raised the issue a second time in his post-trial motion for judgment of acquittal, where he asserted that Agent Rehg repeatedly attempted to misdirect him regarding his *Miranda* rights. R. 182 (Memorandum of Law in Support of Motion for Judgment of Acquittal Notwithstanding the Jury's Verdict or in the Alternative for a New Trial). Because the district court was alerted to the issue and had an opportunity to rule on the merits, the claim is therefore adequately preserved. *United States v. Van Eyl*, 468 F.3d 428 (7th Cir. 2006).

We begin with the words of the *Miranda* warning, and the context in which those words were delivered. Almost as soon as the agents entered the interrogation room, Wysinger asked whether he needed a lawyer. Agent Rehg side-stepped the question and then told Wysinger that he was under arrest. The agent then delivered the following warning to Wysinger, which he appeared to be reading from a card he extracted from his wallet:

> Before we ask any questions, you must understand you have a right to remain silent. Anything you say can be used against you in court. You have a right to talk to a lawyer for advice before we ask any questions or have one—have an attorney with you during questioning. If you can't afford a lawyer, one will be appointed for you before we ask any questions. Do you understand—

Video at 12:55; R. 287, Tr. at 105.[8] At that point, Agent Rehg, who had been scratching his neck while reading

---

[8] This transcription is based on several careful reviews of the tape, as well as the court reporter's rendition of the tape as it was played during the trial. In this part of the tape, Agent Rehg spoke so softly that it is difficult to hear what he is saying. The court reporter, for example, omitted from the official transcript the words, "you must understand you have a right to remain silent." As transcribed in court, there are thus significant omissions in the warning. Because we have the benefit of the tape itself, and because the district court based its ruling on the tape itself, we will rely on the tape. In all relevant respects, our transcription is consistent with the district court's findings of fact.

the warning, slapped the table loudly, causing Wysinger to move back quickly from the table and exclaim, "Damn!" After explaining that he was killing an insect, Agent Rehg picked up the card again and asked Wysinger if he had ever been arrested. Wysinger replied, "Petty shit." Agent Rehg then asked him, "You understand your rights, though?" and Wysinger replied, "Yeah." Agent Rehg then asked Wysinger if he had a high school or college education, and Wysinger shook his head negatively and said, "None of that." Agent Rehg repeated, "But you understand, right?" and Wysinger again said, "Yeah." Video at 12:55; R. 287, Tr. at 105.

In *Miranda*, the Supreme Court set forth the basic warnings required to preserve a suspect's Fifth Amendment rights:

> At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. . . . The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. . . . [A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation[.] . . . In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him.

*Miranda*, 384 U.S. at 467-73. The Court also provided a handy summary of the now-familiar warnings, as well as the consequences of failing to deliver the warnings:

> To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, . . . [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda*, 384 U.S. at 478-79.

Agent Rehg veered slightly from the standard warning language in a few respects. A potentially serious misstatement of the *Miranda* warning occurred when Agent Rehg told Wysinger that he had the "right to talk to a lawyer for advice before we ask any questions or have one—have an attorney with you during questioning." Taken literally, Agent Rehg told Wysinger that he could talk to an attorney before questioning **or** during ques-

tioning. In fact, Wysinger had a right to consult an attorney both before **and** during questioning. Perhaps because they advise suspects of their rights so often, officers sometimes become lax with the wording of the warning and risk a misstatement of the law. Agent Rehg's wallet card is not part of the record on appeal and so we do not know if the card is incorrect or if Agent Rehg simply misspoke when he changed the "and" to an "or." The district court, which considered the same video and transcript that we are analyzing, also found that Agent Rehg told Wysinger that "he had a right to talk to a layer [sic] for advice before questioning **or** to have an attorney present during questioning[.]" R. 151, at 10 (emphasis added). The court found that this warning was adequate under *Miranda*.

We review the district court's findings of fact for clear error, but there is no dispute here regarding the actual words that Agent Rehg spoke when he read Wysinger his rights. *See Peters*, 435 F.3d at 750-51. The legal effect of those words, though, is a question of law that we review *de novo*, and it is the legal sufficiency of the warning that is at issue here. *Peters*, 435 F.3d at 751. The Supreme Court has repeatedly declined to dictate the particular words in which the *Miranda* information must be conveyed. *See Florida v. Powell*, 130 S. Ct. 1195, 1204 (2010) (noting that, although the four warnings *Miranda* requires are invariable, the Court has never dictated the words in which the essential information must be conveyed); *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (commenting that the Court has never required that *Miranda* warnings be given in the exact form described in that decision); *California v. Prysock*, 453 U.S. 355, 359-60 (1981)

(remarking that *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures). However, the words the officer employs must reasonably convey to a suspect his rights as required by *Miranda*. *Powell*, 130 S. Ct. at 1204-05 (the relevant inquiry is whether the warnings reasonably conveyed to a suspect his rights as required by *Miranda*; the words used must be sufficiently comprehensive and comprehensible when given a commonsense reading); *Duckworth*, 492 U.S. at 202 (a fully effective equivalent of the warnings listed in *Miranda* is sufficient); *Prysock*, 453 U.S. at 359-60 (the *Miranda* warnings or their equivalent will suffice).

The wording of Agent Rehg's warning may have been inadequate by this standard. The agent's divergence from the familiar script would put a suspect to a false choice between talking to a lawyer before questioning or having a lawyer present during questioning, when *Miranda* clearly requires that a suspect be advised that he has the right to an attorney both before and during questioning. In *Powell*, the officer delivering the *Miranda* warning told the suspect that he had "the right to talk to a lawyer before answering any of our questions," and that he had "the right to use any of these rights at any time you want during this interview."[9] 130 S. Ct. at 1200. The Court found the warning sufficient:

---

[9] There was no dispute in *Powell* regarding whether the officer adequately conveyed the other *Miranda* warnings. The only issue was whether the warning was sufficient to convey the right to the presence of counsel before and during interrogation.

> The first statement communicated that Powell could consult with a lawyer before answering any particular question, and the second statement confirmed that he could exercise that right while the interrogation was underway. In combination, the two warnings reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times.

*Powell*, 130 S. Ct. at 1205. Unlike the warning in *Powell*, Agent Rehg's statement of *Miranda* rights did not reasonably convey the right to have an attorney present "not only at the outset of interrogation, but at all times." *Id*.

In *Duckworth*, the warning given to the suspect included the admonition, "You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning." 492 U.S. at 198. But after advising the suspect that he had the right to an attorney even if he could not afford to hire one, the police officer also told him, "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." *Id*. The Court found that this language did not mislead the suspect into believing that he did not have the right to a lawyer unless charges were filed and he went to court. Rather, it accurately described the process for obtaining appointed counsel in that jurisdiction. *Miranda* itself did not require the police to provide the lawyer or have a station house lawyer present at all times to advise arrestees. *Duckworth*, 492 U.S. at 203-04. The Court noted that *Miranda* required only that the police not

question a suspect unless he waives his right to counsel. *Id*. The Court asserted that reviewing courts "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement." *Duckworth*, 492 U.S. at 203 (quoting *Prysock*, 453 U.S. at 361). Instead, a reviewing court should consider whether the warnings reasonably conveyed to the suspect his rights as required by *Miranda*. *Duckworth*, 492 U.S. at 203.

Similarly, in *Prysock*, the Court found that the warnings given were adequate even though not given in the usual order:

> It is clear that the police in this case fully conveyed to respondent his rights as required by Miranda. He was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one. These warnings conveyed to respondent his right to have a lawyer appointed if he could not afford one prior to and during interrogation.

*Prysock*, 453 U.S. at 361. But Wysinger was not informed "of his right to have a lawyer present prior to and during interrogation." *Id*. Although there is no particular language that must be used to convey the warnings, and although we are not to construe the words of the warning as if reading the terms of a will or an easement, the difference between an "and" and an "or," depending on the context, may cause a serious misunderstanding of one of the core *Miranda* rights. *See Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (plurality) ("[j]ust as no talismanic incantation is required to satisfy [*Miranda*'s]

strictures, . . . it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance") (internal quotation marks and citations omitted).

A person given a choice between having a lawyer with him before questioning or during questioning might wait until it is clear that questioning has begun before invoking his right to counsel. As we noted above, the *Miranda* safeguards apply not only to express questioning but also to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01. Although judges and lawyers know that interrogation encompasses more than direct questioning, the average citizen may be unaware that *Miranda*'s protection extends to these additional tactics. A correctly worded *Miranda* warning avoids this confusion by alerting the suspect that he or she has an immediate right to an attorney and also a right to have an attorney present during questioning. *See Berghuis*, 130 S. Ct. at 2260 (full comprehension of the rights to remain silent and to request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process). But an incorrectly worded *Miranda* warning, one that suggests that *Miranda* rights apply only to direct questioning or to the time before direct questioning, followed by diversionary tactics that redirect the suspect away from asserting those rights, frustrates the purpose of the *Miranda* protections. *See Seibert*, 542 U.S. at 621-22 (noting that the *Miranda* rule

would be frustrated if police were allowed to undermine its meaning and effect by using a technique that creates too high a risk that a post-warning statement would be obtained when a suspect was deprived of the "knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.") (Kennedy, J., concurring in the judgment) (quoting *Moran v. Burbine*, 475 U.S. 412, 423-24 (1986)).

**2.**

Perhaps this error in wording alone would not be enough to necessitate the exclusion of the entire video-taped interrogation if it was otherwise clear that Wysinger properly understood his rights in the context in which they were given. But Wysinger contends that the warning appeared to condition his rights on the beginning of "questioning" and the agents then implied that questioning had not yet begun. According to Wysinger, the agents repeatedly attempted to divert his attention from asserting his rights. The diversion began, according to Wysinger, one minute into the interrogation, when he asked Agent Rehg, "Do I need a lawyer before we start talking?" and Agent Rehg replied, "Well, we're going to talk about that." But the agent did not answer Wysinger's question until he asked it a second time approximately nine minutes later. Instead of answering Wysinger's first question, Agent Rehg read Wysinger his rights as we detailed above. Near the conclusion of the ambiguously phrased warning, Agent Rehg slammed the table loudly, startling Wysinger and further diverting him

from the question he had just asked regarding his need for a lawyer. After determining that Wysinger had been arrested previously only for petty crimes and lacked a high school or college education, Agent Rehg then repeatedly implied that questioning had not yet begun. He first told Wysinger:

> You know, listen, we're going to cut to the chase, and we're going to lay it out for you a little bit. It's going to be up to you what you want to do. . . . I'm gonna tell you what the story is. You listen for a minute.

Video at 12:55-12:56; R. 287, Tr. at 105-06. This implied that Wysinger could decide whether to exercise his rights after Agent Rehg "la[id] it out for" him and told him "what the story is," and that, in the meantime, he should "listen for a minute." The time to invoke his rights, in other words, had not yet arrived. The "story" consisted of Agent Rehg telling Wysinger that the DEA had been watching him since the prior year, that they had seized drugs from his brother and both drugs and cash from some of his associates, and had intercepted a number of phone calls involving Wysinger, his brother and others. Not surprisingly, this provocative speech prompted some incriminating responses from Wysinger, as the speech was undoubtedly designed to do. *See Miranda*, 384 U.S. at 450 (describing the interrogation tactics of displaying an air of confidence in the suspect's guilt and appearing to be interested only in confirming certain details); *Innis*, 446 U.S. at 299 (noting that tactics such as positing the guilt of the suspect, minimizing the moral seriousness of the offense, and casting blame

on the victim or society, in a custodial setting, amount to interrogation as effective as express questioning).

Agent Rehg then told Wysinger that "basically there are two choices here." Interestingly, neither of them involved invoking his right to remain silent or his right to have counsel present. Instead, Agent Rehg told Wysinger:

> If you totally—if you didn't want to talk with us, down the road most likely you're going to be charged with conspiracy to distribute cocaine. Conspiracy is a tough charge.

Video at 12:59; R. 287, Tr. at 108. After a response from Wysinger, Agent Rehg presented the other choice, co-operation, framed as whether Wysinger wanted to "help [him]self." Wysinger was far more interested in helping his brother but Agent Rehg clearly told him the charges against his brother would not be dismissed. After Wysinger made arguably the most incriminating state-ment of the interrogation,[10] Agent Rehg again told him

---

[10] That statement was: "There's a whole lot of motherfuckers in Texas I do not like. . . . And I tell motherfuckers, in this game, you don't fuck with those people, 'cause you make enemies. You know what I'm saying? You always keep the motherfucker happy if you doing this type of shit 'cause the motherfucker come back to haunt you. You know what I'm saying?" Video at 13:00. The government made repeated references to this statement throughout trial and closing arguments. The government argued to the jury that the

(continued...)

he was going to explain "how this works." Video at 13:00; R. 287, Tr. at 109. The agent then described the process of cooperation. Wysinger again tried to strike a deal to benefit his brother, but Agent Rehg made it clear that Tryd Wysinger's fate was in the hands of the United States Attorney and the judge assigned to the case.

At that point, Agent Rehg finally indicated that the "questioning" part of the meeting was commencing, stating, "Well, tell us what has been going on. Maybe that's the best way to start." Video at 13:03; R. 287, Tr. at 111. By indicating that this was "the best way *to start*," Agent Rehg confirmed that this was the beginning of questioning, implying that the first nine minutes of the meeting did not constitute interrogation. This implication, of course, was contrary to the broad definition of interrogation adopted by the Supreme Court, which includes any words that the police should know are likely to elicit an incriminating response. *Innis*, 446 U.S. at 300-01. For the first time since the interrogation began, Agent Rehg flipped open his notebook and pulled out a pen. At this, Wysinger seemed to recognize that "questioning" was starting and he then clearly invoked his right to a lawyer as we concluded above.

Although we have already determined that the court should have excluded the video from that point forward, we will recount the continued pattern of diver-

---

[10] (...continued)
"game" to which Wysinger referred is the "drug business." R. 290, Tr. at 23.

sion because it relates to and supports Wysinger's claim of misleading *Miranda* warnings. Rather than respond to Wysinger's direct and immediate question of whether he could call an attorney at that instant, Agent Rehg again diverted Wysinger: he asked questions about the lawyer, gave some incorrect "advice" about whether Wysinger could use the same lawyer that his brother was using, and continued the interrogation for twenty-three more minutes. *See Lee*, 413 F.3d at 627 (expressing concern over police tactics of attempting to persuade suspect who had just invoked his right to counsel to give up his asserted right). During this time, Wysinger struggled to remember the name and phone number of the attorney, made a few more incriminating state-ments, asked the agents if they could retrieve the lawyer's phone number from his van, and finally repeated yet again his desire to call the lawyer, asking the agent to get the number for him so that he could "call this attorney, get his advice." Video at 13:07; R. 287, Tr. at 114.

Agent Rehg himself testified at trial that when Wysinger said he did not want to cross any lines and then regret it, he understood that Wysinger did not wish to speak without an attorney:

> He wanted to work with us, he wanted to cooperate. He just didn't want to tell us about his drug dealings at that time until he had an attorney with us. He didn't want to cross the line, as he said, until he had an attorney.

R. 287, Tr. at 125. Agent Rehg was interpreting a state-ment Wysinger made at time index 13:06, one minute

before Wysinger said, "I'm going to call this attorney, get his advice," and some twenty minutes before the end of the video. Agent Rehg thus conceded that he understood that Wysinger had invoked his right to counsel no later than time index 13:06. If there was any doubt about the agent's use of tactics intended to divert Wysinger from asserting his rights, Agent Rehg's continuation of interrogation after that moment demonstrated the strategy from the beginning. *See Smith*, 469 U.S. at 98 (the *Edwards* bright-line rule—that all questioning must stop after an accused requests counsel—prevents the police, through badgering or over-reaching, whether explicit or subtle, whether deliberate or unintentional, from wearing down the accused and persuading him to incriminate himself notwithstanding his earlier request for counsel).

In sum, after Wysinger asked in the first minute of the interrogation if he should call a lawyer, Agent Rehg first told Wysinger that they were "going to talk about that," and then read a potentially misleading version of his rights, one that put Wysinger to the false choice of talking to a lawyer before questioning or having a lawyer with him during questioning. Rather than correcting this error, the agent then magnified the mistake by repeatedly implying that "questioning" had not yet begun. The agent then narrowed Wysinger's options even further, telling him he had two choices, namely cooperating or being charged with conspiracy. The agent failed to mention that Wysinger had two other options: to remain silent, or to consult a lawyer immediately and to have one with him during the inter-

rogation. When it was obvious to Wysinger that "ques-
tioning" had begun, he immediately invoked his right
to counsel.

Even after Agent Rehg clearly recognized that Wysinger
had asked for a lawyer, and after the agent permitted
Wysinger to call an attorney, he continued to interrogate
Wysinger and continued to compound the misimpres-
sion he created by emphasizing "questioning" as the
trigger for *Miranda* protections:

> The deal is this. If we decide to release you today,
> and again, *I am not asking you questions. You want an
> attorney. Let me just give you some advice.* If you have
> any hopes of cooperating, you need to leave it alone
> down here. Only person you can talk to down here
> is your attorney. Don't be talking to anybody else,
> any of the guys that we're talking to.

Video at 13:21; R. 287, Tr. at 118-19 (emphasis added). The
agent thus continued to draw a distinction between
"questioning" and "advice," both of which qualify as
interrogation under well-established standards when
the "advice" is likely to elicit an incriminating response.
Wysinger, who had already shown agitation at the
mention of cooperating witnesses, predictably reacted to
this new reference, and threatened to "hurt somebody," a
threat that the government played up during the trial as
evidence of Wysinger's involvement in the conspiracy.
Agent Rehg's ensuing tactics, which may have been
perfectly acceptable in the context of a proper warning,
exacerbated the misimpression created by the botched
warning.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates" the use of the *Miranda* safeguards. *Miranda*, 384 U.S. at 444. *See also Brown v. Illinois*, 422 U.S. 590, 604 (1975) (the burden of showing admissibility rests on the prosecution). The government failed to meet its burden of demonstrating that proper *Miranda* warnings were given. Because the warning Agent Rehg gave applied only to "questioning," because it erroneously suggested that Wysinger had to choose between having a lawyer present before questioning or during questioning, and because the agents used various tactics to confuse Wysinger regarding the start of "questioning" and divert him from exercising his rights, we agree that the warning was inadequate and misleading. The district court, therefore, should have excluded the first nine minutes of the videotaped interrogation. Combined with our prior conclusion that everything after Wysinger invoked his right to counsel should have been excluded, this leads to our conclusion that the entire videotaped interrogation was inadmissible.

## C.

The government contends that, if there was any error in admitting the video, the error was harmless. An error is harmless if it "does not affect substantial rights." Fed. R. Crim. P. 52(a). "To be harmless, an error must have no affect [sic] on the outcome of the trial." *Lee*, 413

F.3d at 627. The government asserts that, even absent the video, the evidence at trial establishing Wysinger's guilt was "overwhelming." The government cites the testimony of the three cooperating co-conspirators, Montez Douglas, Keith Holmes and Sebastion Robinson. The government also points to the money and drugs seized from others in the conspiracy, including the $54,000 that Wysinger claimed as his own in his post-holiday call with Agent Rehg. The government also argues that Wysinger never confessed to being a drug dealer on the video, lessening any prejudicial effect.

We cannot agree that the other evidence was overwhelming. The vast majority of the evidence against Wysinger came from cooperating co-conspirators who each had strong motives to lie and to cast blame away from themselves. Both Holmes and Robinson, for example, had been caught with drugs and/or large amounts of cash. Unlike the witnesses against him, Wysinger was not personally found in possession of drugs or large amounts of cash. And Wysinger was never tied to the cell phone used to make the calls that the government asserted connected him to drugs or money. True, someone claiming to be Wysinger called Agent Rehg to claim ownership of the $54,000 seized from Tryd's van. But without the video, the only evidence connecting Wysinger to that call is Agent Rehg's voice identification of Wysinger. That recorded call was clearly important to the jury, as it was one of two pieces of evidence that the jury requested to review during deliberations.

Moreover, the government's claim that the prejudicial effect of the video was diminished because Wysinger

did not admit to being a drug dealer is belied by the government's use of the video at trial, and by its obvious importance to the jury. *See Innis*, 446 U.S. at 301 n.5 (defining "incriminating response" as "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial") (emphasis in original); *Miranda*, 384 U.S. at 476-77 ("No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination."). At trial, the government first showed the video once in its entirety and then displayed two segments of the video again during Agent Rehg's testimony. In particular, the government replayed the part of the video where Wysinger said, "There's a whole lot of motherfuckers in Texas I do not like. . . . And I tell motherfuckers, in this game, you don't fuck with those people, 'cause you make enemies. You know what I'm saying? You always keep the motherfucker happy if you doing this type of shit 'cause the motherfucker come back to haunt you." Agent Rehg explained that he understood Wysinger to mean that he might be willing to cooperate against certain individuals in Texas he did not like, and that the "game" in Wysinger's statement is the "drug game." R. 287, Tr. at 124. In total, the government managed to refer to this statement no fewer than six times during the trial, and the jury was exposed to it a seventh time when the video was replayed during

deliberations. In addition to showing the statement to the jury twice during Agent Rehg's testimony, Agent Rehg paraphrased the statement, and the government mentioned it once during closing argument and twice more during rebuttal.

The government also replayed Wysinger's statement indicating he was considering cooperating:

> I just don't want to cross no lines, and then, you know what I'm saying, regret shit. I mean, I want to work with you. You know what I'm saying?

Video at 13:06; R. 287, Tr. at 113 and 125. Agent Rehg explained that he understood Wysinger to mean that he wanted to cooperate but did not want to discuss his drug dealing until he had an attorney present. R. 287, Tr. at 125. In addition to two playings during trial and one during deliberations, the government mentioned Wysinger's reference to possible cooperation during closing arguments as well. Given the prominence the government gave to these and other statements from the interrogation at trial, and given that the jury itself accorded special importance to the video, the error in admitting the video likely affected the outcome of the trial and thus was not harmless.

## D.

Wysinger also argues that admitting the portions of the video during which Wysinger spoke to his attorney on the phone violated a Sixth Amendment right to private and confidential communication with his attor-

ney. The government contends that Wysinger waived this claim by not raising it below. Because we have already ruled that this portion of the video should have been excluded because Wysinger had clearly invoked his right to counsel under *Miranda*, we need not address either the claim of waiver or the merits of the issue.

### III.

For the reasons stated above, we vacate Wysinger's conviction and remand for proceedings consistent with this opinion. Any retrial may not include any part of the video in the government's case-in-chief. We thank Wysinger's appointed counsel for their vigorous advocacy on his behalf.

VACATED AND REMANDED.