TINDER, Circuit Judge.
The United States brings this interlocutory appeal from a district court order suppressing statements made by the defendant, Casey Darrel Hunter, to two law enforcement officers who were interrogating him. The district court granted Hunter’s motion to suppress because it found that Hunter had unambiguously invoked his right to counsel before the interrogation with these officers had begun. We agree with the district court that Hunter had unambiguously and unequivocally invoked his right to counsel, and therefore, all questioning by law enforcement officers should have ceased under Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 878 (1981). Because the two officers here interrogated Hunter after he had unambiguously invoked his right to counsel, Hunter’s statements during the interrogation are not admissible.
I
On the afternoon of May 3, 2010, Rock Island Police Officers Timothy Muehler and Jeff Key stopped a pickup truck after they witnessed the two occupants apparently engaging in a drug deal. Shortly after the truck stopped, the defendant, Hunter, fled from the passenger seat of the truck with something resembling a gun in his hand. Officer Muehler ordered Hunter to stop running, but Hunter continued to run. The officers then heard a gunshot. Officer Muehler immediately fired three shots at Hunter, striking him once in the left buttock and once in the foot. Hunter fell to the ground and was handcuffed. Police recovered a six-shot .38 revolver from the ground close to Hunter. The revolver had one spent shell casing in the cylinder.
Police arranged to have Hunter transported to Trinity Medical Center via ambulance so that he could receive treatment for his gunshot wounds. Rock Island Police Detective Gene Karzin, who had arrived at the scene shortly after the shooting, agreed to accompany Hunter in the ambulance and to “babysit” Hunter in the emergency room until the investigating officers arrived. Hunter was handcuffed to the hospital gurney at all times while receiving medical treatment. Although *940 Hunter’s injuries were not life-threatening, Hunter told the emergency room staff that his pain registered at a “ten out of ten,” and as a result, doctors administered morphine, fentanyl, and other narcotics to Hunter in the emergency room. Still, the nurse who had treated Hunter testified that he had remained “alert and oriented” throughout his time in the emergency room. (The district judge found that Hunter’s alertness and capability of making a knowing and voluntary waiver of his rights were not affected by either his injuries or his treatment. That finding is not implicated in this appeal.) While Hunter was receiving treatment, Detective Karzin sat silently in the room until Hunter initiated the following interaction (as recounted by Detective Karzin’s testimony):
Q. Mr. Hunter asked if there were officers in the room, and you identified yourself?
A. Correct.
Q. Okay. At that point is when you advised him of his Miranda rights?
A. Correct.
Q. And after you advised Mr. Hunter of his Miranda rights, what did he say? A. ... one of the questions he asked me is what he was charged with.... He told me that he understood his rights. Then I asked him what occurred today. He said he didn’t know. I asked him if he was willing to speak with me about the incident. He stated that he was willing to talk to me, but he just wanted a minute to think. At that point then he asked me what his charges were.... I walked out of the room because I didn’t know at this point, and I talked to Sergeant Chadwick who, I believe, was waiting in the hallway out there. The only thing Sergeant Chadwick indicated to me was that they had found a gun at the scene.... So, I walked back in, told Mr. Hunter, I said, Well, they found a gun at the scene. Mr. Hunter then responded to me, So, you have me for being a felon in possession of a firearm? I indicated to Mr. Hunter that I believed that that was the case, as at that point I didn’t know of any additional charges.... After that, at that point he asked to make some — several phone calls for him.
Q. And what specifically did the defendant say?
A. Best I can recollect, he said, Hey, can you call my mother and my father? I said, Okay. Do you have numbers for them — names and numbers? And he provided me the names and numbers. And then he says, Can you call my attorney? Told me Mr. Schultz was his attorney. Hospital personnel were still working on him. They were doing their thing. I asked him — after that, I asked him, What do you want me to tell these people? He stated, Tell them that I’ve been shot.
Detective Karzin never made any “attempt to contact Attorney Herbert Schultz,” even though Schultz was a well-known criminal defense attorney with whom Karzin had worked on several previous cases. Instead, he waited for Illinois State Police Investigator Dyan Morrisey and Milan Police Detective Chris George, who were assigned to investigate the case, to arrive at the emergency room. At that time, Karzin “indicated to Investigator Morrisey and George the information that [Hunter] provided and that he requested, that we contact three individuals and inform them that he had been shot.” Morri-sey and George did not remember Karzin telling them to call Schultz, so without any further action, they entered Hunter’s hospital room and began interrogating him less than two hours after he had been shot.
Investigator Morrisey and Detective George began the interrogation by reading *941 Hunter his full Miranda rights from a pre-printed card. Hunter did not ask Morri-sey and George to call his attorney, nor did Hunter mention his earlier request that Karzin call his attorney. However, Hunter did ask Morrisey and George, “Do you know my attorney, Herb Schultz?” Morrisey and George did not view Hunter’s question as an invocation of the right to counsel, and proceeded with their questioning. During the interrogation that followed, Hunter made incriminating statements, including an admission that he was in the pickup truck because “he was actually making a gun transaction with [the driver,] Buddy.”
Hunter’s incriminating statements to Morrisey and George combined with the evidence found at the scene of the shooting led to Hunter’s indictment on June 22, 2011 for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g), 924(a)(2). Soon after his indictment, Hunter filed a motion to suppress his statements to Morrisey and George, claiming that he had “clearly and unequivocally invoked his right to counsel under Miranda by telling Detective Karzin, immediately upon receiving the Miranda admonishments, ‘to call my mother, my father, and my lawyer, Herb Schultz.’ ” Hunter argued that because he had made a clear and unequivocal request for counsel to Detective Karzin, he should have never been subject to Morrisey and George’s subsequent interrogation.
The district court agreed with Hunter, finding “no reasonable dispute” that Hunter’s question, “Can you call my attorney?” was an unambiguous invocation of his right to counsel. The district court further rejected the government’s argument that Hunter’s request should be interpreted in light of his subsequent behavior:
The government argues that, in telling his attorney that he has been shot, he is not invoking his Miranda rights. This argument fails, because once he stated that he wanted them to call his attorney, he had invoked his Miranda rights, and once done, the police could not go on to question him without a clear indication from him that he did not wish to have an attorney present.
As a result, the district court granted Hunter’s motion to suppress his statements to Investigator Morrisey and Detective George on January 27, 2012.
A month later, the government filed a motion asking the district court to reconsider its January 27, 2012 order suppressing Hunter’s statements. The government emphasized that Edwards did “not require police officers to cease all conversation or communication with a defendant once a defendant requests counsel; rather, it requires that interrogation cease.” Detective Karzin’s question, “What do you want me to tell these people?” did not amount to interrogation, the government argued, because it “was not reasonably likely to elicit an incriminating response.” Consequently, the government asserted that consideration of Hunter’s response, “Tell them that I’ve been shot,” was appropriate when determining whether Hunter unambiguously invoked his right to counsel.
Once again, the district court rejected the government’s argument. On February 28, 2012, the district court denied the government’s motion to reconsider, finding that “What do you want me to tell these people?” amounted to interrogation. The court reasoned, “[W]hat answer could [Hunter] give that — other than perhaps the one he did — that would not be incriminatory? Or ... what would this detective ... have expected that this guy was going to say to that question?” After the district court held for a second time that it would suppress Hunter’s statements to Investigator Morrisey and Detec- *942 five George, the government filed this timely interlocutory appeal. On appeal, we review the district court’s decision on Hunter’s motion to suppress “de novo ..., but we review all findings of historical fact and credibility determination deferentially, under the clear error standard.” United States v. Johnson, 170 F.3d 708, 712-13 (7th Cir.1999).
II
Whether the district court correctly granted Hunter’s motion to suppress hinges on whether Hunter’s request, “Can you call my attorney?” was an unambiguous invocation of his right to counsel. If Hunter’s request was unambiguous, then the U.S. Supreme Court’s holding in Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880, controls: an “accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.” In contrast, if Hunter’s request was ambiguous, then the Court’s holding in Davis v. United States, 512 U.S. 452, 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) controls: “if a reference is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, Edwards does not require that officers stop questioning the suspect.”
Once a court decides whether a defendant’s request for counsel is ambiguous, the analysis is simple. Unfortunately, in most cases — as in the case presently on appeal — the difficult decision is whether the defendant’s request for counsel was ambiguous. Connecticut v. Barrett, 479 U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) offers some guidance, requiring courts to evaluate a defendant’s request “as ordinary people would understand” it, and “to give a broad, rather than a narrow, interpretation to a defendant’s request for counsel.” Even more helpful is the guidance provided by reviewing the facts of previous cases that have come before both the Supreme Court and our court. We turn to a review of those cases now.
Ill
Both the Supreme Court and our court have found statements indicating a certain and present desire to consult with counsel enough to invoke a defendant’s right to counsel under Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For example, in Edwards, 451 U.S. at 479, 101 S.Ct. 1880, the defendant, Robert Edwards, was in the middle of a police interrogation when he stated, “I want an attorney before making a deal.” The Supreme Court held that Edwards’s statement unambiguously “expressed his desire to deal with the police only through counsel,” and as a result, Edwards’s subsequent confession was inadmissible (since the confession was the result of continued police questioning without an attorney). Id. at 484-85, 101 S.Ct. 1880. Similarly, in Smith v. Illinois, 469 U.S. 91, 97, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), police asked the defendant, Steven Smith, if he would like to have an attorney present during questioning, and he replied, “Uh, yeah, I’d like to do that.” Instead of ceasing their interrogation after Smith requested an attorney, however, the police continued questioning Smith, and Smith confessed to armed robbery. The Supreme Court held that Smith’s confession was inadmissible because “with the possible exception of the word ‘uh’ the defendant’s statement in this case was neither indecisive nor ambiguous.” Id. (citations omitted).
*943 Following the direction of Edwards and Smith, our court has found statements indicating a certain and present desire to consult with counsel sufficient to invoke a defendant’s right to counsel. For instance, in United States v. Lee, 413 F.3d 622, 625 (7th Cir.2005), the defendant, Kenneth Lee, appealed his conviction of drug possession with intent to distribute based on the district court’s admission of his confession after he allegedly invoked his right to counsel. The police had obtained a search warrant for Lee’s apartment, and during the search, two police officers took Lee to a bathroom to explain the warrant to him. The officers then read Lee his Miranda rights and asked if Lee was willing to talk to them. Lee responded, “Can I have a lawyer?” Id. at 624. Our court found that Lee’s request constituted an unambiguous request for an attorney, comparing Lee’s statement to similar statements found by other circuits to be unequivocal. See, e.g., Cannady v. Dugger, 931 F.2d 752, 755 (11th Cir.1991) (“I think I should call my lawyer.”); Robinson v. Borg, 918 F.2d 1387, 1391 (9th Cir.1990) (“I have to get me a good lawyer, man. Can I make a phone call?”); Smith v. Endell, 860 F.2d 1528, 1529 (9th Cir.1988) (“Can I talk to a lawyer? At this point, I think maybe you’re looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?”).
Most recently, our court found an even less direct statement by a defendant enough to constitute an unambiguous invocation of the right to counsel. In United States v. Wysinger, 683 F.3d 784, 790-91 (7th Cir.2012), the defendant, John Wy-singer, appealed his conviction of conspiracy to distribute and possess cocaine, based on the district court’s admission of his videotaped interrogation by Drug Enforcement Administration (DEA) agents into evidence, despite the fact that Wysinger allegedly invoked his right to counsel. During Wysinger’s interrogation, he had the following exchange with DEA agents:
Rehg: Well, tell us what has been going on. Maybe that’s the best way to start. Wysinger: I mean, do you think I should have a lawyer? At this point? Rehg: That is up to you.... I read you your rights. If you want an attorney, by all means, get one. Ok?
Wysinger: I mean, but can I call one now? That’s what I’m saying.
Id. at 790. Our court found that Wysinger’s statements were enough to constitute an unambiguous invocation of the right to counsel. We acknowledged that “ T mean, do you think I should have a lawyer?’ ... [did] not constitute an unequivocal request for counsel.” Id. at 795. Nonetheless, we believed that “Wysinger’s very next sentence clarified the request and removed all doubt as to his meaning.... T mean, but can I call one now? That’s what I’m saying,’ ... in context, was an unequivocal request for counsel that no reasonable officer could interpret otherwise.” Id. at 795-96.
In light of Lee and Wysinger, the text of Hunter’s request to Detective Karzin appears to be an unambiguous request for counsel. Hunter’s request, “Can you call my attorney?” sounds remarkably similar to the defendant’s request in Lee, “Can I have a lawyer?” which we found sufficient to invoke the right to counsel. 413 F.3d at 626. Furthermore, Hunter’s request sounds more certain and more definitive than the statement that we found sufficient in Wysinger, “1 mean, but can I call one now?” 683 F.3d at 795. Indeed, comparing the text of the three requests side-by-side reveals several similarities in Hunter’s, Lee’s, and Wysinger’s requests. All three defendants asked questions of a police officer who had previously read the defendants their Miranda rights. Instead *944 of using a word like “should” or “might,” which would suggest that the defendants were still undecided about whether they wanted a lawyer, all three defendants used the word “can.” The defendants’ choice of the word “can,” by definition, means that they were inquiring into their present ability to be “able to” obtain a lawyer or to “have the opportunity or possibility to” obtain a lawyer. Can, Oxford Dictionaries Pro Online, http://english.oxforddict ionaries.com/definition/ean?region=us& rskey=OBo6rG&result=l (last visited Feb. 26, 2013). In sum, given the text of the previous statements that our circuit has found sufficient to invoke the right to counsel, the text of Hunter’s request was sufficient to have put a reasonable officer on notice that Hunter was invoking his right to counsel.
IV
Comparing the text of Hunter’s request, “Can you call my attorney?” to the requests of defendants that the Supreme Court and our court have found insufficient to invoke the right counsel strengthens our conclusion that Hunter’s request was sufficient. In Davis, 512 U.S. at 455, 114 S.Ct. 2350, the defendant, Robert Davis, was being questioned by investigators when he remarked, “Maybe I should talk to a lawyer.” Investigators followed up on Davis’s remark by asking him if he wanted a lawyer. Davis replied, “No, I’m not asking for a lawyer.” Id. The Supreme Court held that Davis had not invoked his right to counsel, and consequently, all subsequent statements to investigators were admissible. Id. at 462, 114 S.Ct. 2350; cf. United States v. Zamora, 222 F.3d 756, 761 (10th Cir.2000) (“[I]f that’s the case, then — then I might want to talk to an attorney.”).
Similarly, in United States v. Shabaz, 579 F.3d 815, 818 (7th Cir.2009), the defendant, Samuel Shabaz, asked an FBI Agent, “[A]m I going to be able to get an attorney?” as they entered an interview room (before any interrogation had begun). The agent did not respond to the question and left Shabaz alone in the interview room for a few minutes. Upon re-entering the room, the agent read Shabaz his Miranda rights; Shabaz expressly waived these rights and proceeded to confess to bank robbery. Here, our court found that Sha-baz’s statement did “not clearly imply ‘a present desire to consult with counsel.’ ... The words ... did not unambiguously indicate to Agent Watson that Shabaz was right then asking for an attorney.” Id. at 819 (citation omitted). Thus, our court found that the district court had properly admitted Shabaz’s confession. Id.
In the present case, the text of Hunter’s statement is more definitive than the statements by the defendants in both Davis and Shabaz, and as a result, is readily distinguishable. As discussed in the previous section, Hunter used the decisive word “can” when he asked Detective Karzin to call his attorney. In contrast, the defendant in Davis used the indecisive words “maybe” and “should.” “Maybe” means only “perhaps” or “possibly,” while “should” is “used to ... ask advice or suggestions.” Maybe, Oxford Dictionaries Pro Online, http://english.oxforddic tionaries. eom/definition/maybe?region=us (last visited Feb. 26, 2013); Should, Oxford Dictionaries Pro Online, http:// english. oxforddictionaries. com/ definition/ should?region=us (last visited Feb. 26, 2013). In other words, the text of Davis’s statement indicates that he was undecided whether he wanted an attorney present.
Shabaz’s statement was more decisive than Davis’s, but it still lacked the “present desire to consult with counsel” seen in *945 Hunter’s statement. Shabaz, 579 F.3d at 819. Shabaz asked if he was “going to be able to get an attorney.” Id. “Going to” is a form of the future tense; Shabaz’s verb choice indicates a possible desire to obtain an attorney in the future, not presently. Go, Oxford Dictionaries Pro Online, http://english.oxforddictionaries.com/ definition/go?region=us&rskey=rZWvP 5&result=l# m_en_usl251252.023 (last visited Feb. 26, 2013). Another notable distinction is that Shabaz’s statement came before his interrogation had begun. Hunter’s statement, in contrast, came after Detective Karzin asked Hunter “if he was willing to speak ... about the incident.” All in all, the text of Davis’s and Shabaz’s statements lack the indicia of a certain and present desire to consult with counsel seen in the text of Hunter’s request.
V
In addition to the actual text of Hunter’s statement, “Can you call my attorney?” both sides urge our court to consider the context of Hunter’s statement in order to determine whether it was ambiguous. Hunter asks us to consider what happened prior to Hunter asking Detective Karzin to call his attorney. Hunter was handcuffed to a hospital gurney. After he had been read his Miranda rights by a police detective, he told the detective that he wanted “a minute to think” before he talked about the shooting. The detective then told Hunter that police had found a gun at the scene, which Hunter interpreted to mean that he was facing the serious charge of being a felon in possession of a firearm. In the context of these prior events, Hunter argues that his request, “Can you call my attorney?” constituted an unambiguous invocation of his right to counsel. On the other hand, the government asks us to consider what happened subsequent to Hunter asking Detective Karzin to call his attorney. Hunter only requested that Karzin tell his attorney he had been shot— and Hunter never repeated his request for an attorney during Morrisey and George’s ensuing interrogation. In the context of these subsequent events, the government argues that Hunter’s request was, at best, an ambiguous request of his right to counsel.
In order to determine whether it is appropriate to consider the context prior or subsequent to Hunter’s request, we turn to Smith, 469 U.S. at 98, 105 S.Ct. 490, for guidance:
Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused’s subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.
Smith confirms that courts should only consider prior context when determining whether a defendant unambiguously invoked his right to counsel. (The government does not contend that Hunter’s comment, “Tell them that I’ve been shot,” constitutes waiver of an invocation of the right to counsel, and rightly so.)
Following the Supreme Court’s directive in Smith, we have often looked to prior context when determining whether a defendant unambiguously invoked his right to counsel. For example, in Lord v. Duckworth, 29 F.3d 1216, 1218 (7th Cir.1994), we looked to the events prior to the defendant’s statement in order to determine that the statement was ambiguous. The defendant in that case, Charles Lord, sought habeas corpus review of his Indiana state murder conviction based on, among other things, the admission of evidence at *946 trial that came from a police interrogation after Lord allegedly requested counsel. While still a suspect in the murder case, Lord had given an eighty-minute-long statement to police about the murder, “including incriminating admissions. When the statement was completed, Lord agreed to assist the police in finding the gun that was used in the crime.” Id. Only then did Lord state to the police officer, “I can’t afford a lawyer but is there anyway I can get one?” Id. Out of context, the text of Lord’s statement might have been enough to invoke the right to counsel. But in context — particularly in light of Lord’s complete cooperation with authorities before requesting an attorney — we concluded that “Lord’s statement lacked the clear implication of a present desire to consult with counsel.” Id. at 1221.
Prior context of the defendant’s statement also formed the basis of our decision in United States v. Hampton, 675 F.3d 720, 727-28 (7th Cir.2012). In that case, the defendant, Deandre Hampton, could not decide whether he wanted counsel. First, he signed a Miranda waiver; almost immediately, he “changed his mind and invoked his right to counsel, which was honored[, and] questioning immediately ceased.” Id. at 727. Soon after, Hampton told his cell guard that “he wanted to proceed without counsel.” Id. The questioning police officers administered new Miranda warnings, and one officer asked Hampton specifically if he wanted a lawyer. Hampton responded, “Yeah, I do, but you....” Id. Hampton then fell silent and asked the police “how the presence of an attorney would affect his situation.” Id. at 728. The police attempted to respond to this question, at which point Hampton began trying to “fish ... for a deal” while making incriminating statements. Id. In this context, our court found that the statement, “Yeah, I do, but you.... ” was ambiguous, and Hampton had not invoked his right to counsel. While the text, “Yeah, I do,” on its own would suggest that Hampton was invoking his right to counsel, we found that Hampton’s use of the “hedge word ‘but’ ” in the same sentence indicated “only that Hampton might want an attorney present,” and consequently, Hampton’s request was ambiguous. Id. at 727. Moreover, we found that consideration of the prior context supported our close textual reading of “Yeah, I do, but you ...” as an ambiguous statement. Throughout his previous dealings with police, Hampton had vacillated back and forth between wanting counsel and not wanting counsel; reading Hampton’s statement in light of this prior context made “Yeah, I do, but you ...” appear to be more of the same indecision.
Like Hampton, we find that considering the prior context of Hunter’s statement in the present case supports our close textual reading of Hunter’s statement in Sections III and IV. In those sections, we noted that Hunter used decisive language like the word “can” — as opposed to indecisive words like “should” — indicating that Hunter’s request, “Can you call my attorney?” was inherently unambiguous. Hunter’s request becomes particularly unambiguous when read in light of what had occurred previously. Hunter asked Detective Kar-zin, “Can you call my attorney?” only after he had been arrested, handcuffed to a hospital gurney, read his Miranda rights, and asked if he wanted to speak to a police detective. Moreover, Hunter’s request to Detective Karzin followed his statement that he wanted “a minute to think” before he talked about the shooting and came on the heels of his inquiry whether police had him for being a felon in possession of a firearm. With everything that happened prior to Hunter asking Detective Karzin to call his attorney, the context lends further *947 support to our conclusion that Hunter’s request for counsel was unambiguous.
VI
At oral argument, the government suggested that a ruling adverse to its position might discourage police officers from asking suspects “open-ended, benign, legitimate, clarifying” questions in the future. The government contends that its law enforcement officers want to follow the advice of the Supreme Court in Davis, which encourages (but does not require) “officers to clarify whether a suspect making an ambiguous statement really wants an attorney.” Davis, 512 U.S. at 453, 114 S.Ct. 2350. The government believes that the only way that its law enforcement officers will heed the Supreme Court’s advice in Davis is by allowing officers to ask any number of clarifying questions like the one Detective Karzin asked Hunter, as long as these questions do not attempt to “undercut” the suspect or “to get [the suspect] to change his mind.”
Like the Supreme Court in Davis, we also want to encourage officers to clarify whether a suspect wants an attorney, but only if the suspect makes an ambiguous statement. If the suspect makes an unambiguous request for an attorney, then there should be no need for clarification. Indeed, allowing police officers to continue asking questions — no matter how “benign” or “open-ended” — after a suspect unambiguously requests an attorney could indirectly undercut the suspect and eventually cause the suspect to question his initial, unambiguous request for an attorney.
As the district court found, there is no evidence here that Detective Karzin acted in bad faith or had any intention of undercutting Hunter when he asked the followup question, “What do you want me to tell these people?” But no matter how benign his intentions, Detective Karzin’s follow-up question was an invitation to disaster. Hunter could have easily responded to Detective Karzin’s question with an incriminating statement such as, “Tell them I fired a gun at a police officer.” (Fortunately for Hunter, his actual response, “Tell them I’ve been shot,” was not incriminating.) It is for this reason that the district court asked the government, “[W]hat answer could [Hunter] give that— other than perhaps the one he did — that would not be incriminatoi’y? ... [W]hat would this detective ... have expected that [Hunter] was going to say to that question?” Any question that is “reasonably likely to elicit an incriminating response” and asked by a police officer after a suspect has unambiguously invoked his right to counsel constitutes prohibited interrogation. Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).[1] The district court *948 concluded, as we conclude, that Detective Karzin’s statement was “reasonably likely to elicit an incriminating response”— whether Detective Karzin intended it to do so or not.
Not only was Detective Karzin’s followup question reasonably likely to elicit an incriminating response, but it was also wholly unnecessary. Hunter had just been shot, arrested, handcuffed to a hospital gurney, and read his Miranda rights by a police detective. Why else would Hunter have wanted to call his well-known criminal defense attorney other than to invoke his right to counsel? Even assuming Detective Karzin did not intend his question to undercut Hunter’s request for counsel, given the circumstances, Hunter could have viewed Detective Karzin’s follow-up question as an indirect way of undercutting his request for counsel. It is precisely for this reason that the Supreme Court held in Smith, “Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease.” 469 U.S. at 98, 105 S.Ct. 490 (emphasis added).
VII
Given the decisive language and the pri- or context of Hunter’s request to Detective Karzin, we find that Hunter’s request, “Can you call my attorney?” was an unambiguous and unequivocal request for counsel. Consequently, under Smith, 469 U.S. at 98, 105 S.Ct. 490, all questioning by Detective Karzin should have ceased as soon as Hunter made this request. Because questioning did not cease, however, it would be inappropriate under Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880, for the court to consider Hunter’s subsequent statements to Detective Karzin, Investigator Morrisey, and Detective George for any purpose. As a result, we AFFIRM the decision of the district court to suppress Hunter’s subsequent statements, including the incriminating statements that Hunter made to Investigator Morrisey and Detective George.

. The dissent relies heavily on Innis, 446 U.S. at 298-304, 100 S.Ct. 1682, finding it disposi-tive as to whether Detective Karzin's followup question to Hunter constituted prohibited police interrogation. The facts in Innis are so different from the case at hand that we do not find it particularly illuminating. Innis clarified that "not ... all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation.” Id. at 300, 100 S.Ct. 1682. Instead, only the statements obtained by police "from a person in custody ... subjected to either express questioning or its functional equivalent” are the product of interrogation. Id. at 300-01, 100 S.Ct. 1682. According to the Court, the defendant in Innis was not subjected to express questioning or its functional equivalent when he made incriminating statements to the police. Id. at 301-04, 100 S.Ct. 1682. But the defendant in Innis made his incriminating statements under completely different circumstances than the defendant in the instant case. In Innis, police never spoke directly to the defendant after he invoked his right to counsel. Instead, the defendant overheard the conversation between two police officers while riding in the back of *948 a patrol car and interrupted their conversation with incriminating information. Id. at 294-96, 100 S.Ct. 1682. Contrast Hunter's situation, in which Detective Karzin not only spoke directly to Hunter — but expressly questioned him — when he asked, “What do you want me to tell these people?”
Nor does the dissent gain any ground by relying on the “direct questioning” language of United States v. Briggs, 273 F.3d 737, 740 (7th Cir.2001). Although Briggs held that not all direct questioning by police constitutes impermissible “interrogation,” again, the facts of Briggs are so different from the case at hand that we do not find it helpful. In Briggs, the defendant told police officers, ”[I]t doesn't matter anyway. I'm going to die,” after invoking his right to counsel. Id. at 739. Concerned for his mental state and physical well-being, the police responded by asking the defendant what he meant by that statement. Id. We held the police's question did not constitute impermissible interrogation because it was not “reasonably likely to elicit an incriminating response.” Id. at 741 (quoting Innis, 446 U.S. at 301-02, 100 S.Ct. 1682). Contrast Detective Karzin's question, which could have invited any number of incriminating responses by Hunter about his involvement in the gun incident with Rock Island police.