STROUD, Judge.
 

 *222
 
 Rodney Nigee Pledger Taylor ("defendant") appeals from a judgment entered on a jury verdict finding him guilty of first-degree murder. Among defendant's arguments on appeal, defendant argued that the trial court erred in denying his motion to suppress because he invoked his Fifth Amendment right to counsel during a custodial interrogation. In our previous opinion, filed on 5 August 2014, we declined to address defendant's Fifth Amendment argument on the merits and held that the trial court committed no error.
 
 See
 

 State v. Taylor,
 

 235 N.C.App. 426
 
 ,
 
 763 S.E.2d 928
 
 (2014) (unpublished). But on 6 November 2015, on discretionary review, the North Carolina Supreme Court reversed in part this Court's decision and remanded the case to this Court for consideration of "defendant's Fifth Amendment argument on the merits."
 
 State v. Taylor,
 

 368 N.C. 419
 
 ,
 
 777 S.E.2d 759
 
 (2015). Accordingly,
 
 *226
 
 we address defendant's Fifth Amendment argument on the merits. We find no error.
 

 I. Background
 

 We review our discussion of the factual and procedural background from our previous opinion:
 

 Defendant was indicted for first degree murder on 12 June 2011. He pled not guilty and proceeded to jury trial. Before trial, defendant filed a motion to suppress statements he made to police. He argued that he had been unconstitutionally seized and that he was subjected to custodial interrogation without the benefit of
 
 Miranda
 
 warnings. The trial court denied defendant's motion by order entered 17 January 2013.
 

 At trial, the State's evidence tended to show that on the evening of 23 June 2011, defendant (also known as "Sponge Bob"), Alex Walton (also known as "Biz" or "Mr. Business"), and Floyd Creecy (also known as "Bruno" or "Big Bs") got together to hang out and smoke marijuana. All three men were involved in a local gang named "Bounty Hunters," which was affiliated with the larger "Crips" gang.
 
 [
 

 1
 

 ]
 
 The three men went to a store on Poole Road in east Raleigh to buy some cigars to make "blunts."
 

 *223
 
 They all rode together in the black Chrysler Pacifica owned by Mr. Creecy's wife.
 

 After buying what they needed from the store, the three men got back into Mr. Creecy's car and drove back down Poole Road. Mr. Creecy was driving, defendant was in the passenger seat, and Mr. Walton was sitting in the back. As they were riding down Poole Road, defendant said, "There's Polo," and told Mr. Creecy to pull over. There were three individuals walking down the sidewalk-Darius Johnson (also known as "Polo"), Damal [O'Neal], and Kyonatai Cleveland. Mr. Creecy pulled into a church parking lot behind them. Defendant exited the car and approached the three; Mr. Walton then got out and followed defendant.
 

 As defendant and Mr. Walton approached, Mr. Johnson took out what he had in his pockets, including his cell phone, and gave it to Ms. Cleveland. He also took out a wine opener that he had in his pocket, opened a small knife at the end of the opener, then closed the knife and put the opener back in his pocket. Defendant said to Mr. Johnson, "Why didn't you get back to us?" Mr. Johnson responded, "I don't know." Defendant then said, "Well, I gave you more than enough time." At that point, defendant said to Mr. Walton, "Watch out, Biz," pulled out a black revolver and began shooting at Mr. Johnson.
 

 During this encounter, Ms. Cleveland called 911. However, she was unable to tell the operator what was happening because when they saw the gun, Mr. Johnson and his two friends tried to run. Mr. Johnson was hit by one bullet in his front left abdomen. The forensic evidence suggested that the bullet was fired from a close distance-perhaps less than two feet. After shooting Mr. Johnson, defendant and Mr. Walton ran back to the black Pacifica, which Mr. Creecy had pulled around to the next street. The gun was still in defendant's hand when he got back into Mr. Creecy's car.
 

 At trial, Mr. [O'Neal], Ms. Cleveland, Mr. Walton, and Mr. Creecy all testified to the events of that night. The three men all positively identified defendant as the shooter. Mr. Walton and Mr. Creecy testified that defendant and
 
 *224
 
 Mr. Johnson had an argument approximately a week before the shooting. Mr. Johnson had been asking defendant about joining the Bounty Hunters. Defendant told Mr. Johnson to call him. When Mr. Johnson failed to call him, defendant said that he was going to "bang," i.e. shoot, Mr. Johnson.
 

 Defendant was asked to come to the police station to be interviewed by detectives. He initially denied knowing anything about the shooting, but later admitted that he was in the SUV. He said that the shooter was someone named "Chuck." He later conceded that there was no one
 
 *227
 
 named Chuck but continued to deny that he was the shooter. Defendant claimed that after the shooting, he brought the gun back to his house. The detectives went to defendant's grandmother's house, where he was living. When they arrived, defendant's grandmother informed them that she had found a gun in her grandson's room, under his bed. She explained that she did not want the gun in her house, so she took it outside and hid it in her backyard. The police recovered the gun-a black .38 caliber revolver. Four spent shell casings were found in the revolver. Once the gun was recovered and the interview was complete, defendant was placed under arrest. Upon being transported to the jail, two deputies searched defendant's pockets and found two .38 caliber bullets.
 

 The jury found defendant guilty of first degree murder. The trial court accordingly sentenced defendant to life in prison without the possibility of parole. Defendant gave notice of appeal in open court.
 

 Taylor
 
 ,
 
 235 N.C.App. 426
 
 ,
 
 763 S.E.2d 928
 
 , slip op. at 1-5 (footnote omitted).
 

 II. Discussion
 

 Defendant argues that the trial court erred in denying his motion to suppress because he invoked his Fifth Amendment right to counsel during a custodial interrogation.
 

 A. Standard of Review
 

 The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the
 
 *225
 
 findings of fact support the conclusions of law. However, when ... the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal. Conclusions of law are reviewed de novo and are subject to full review. Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.
 

 State v. Biber,
 

 365 N.C. 162
 
 , 167-68,
 
 712 S.E.2d 874
 
 , 878 (2011) (citations and quotation marks omitted).
 

 B. Analysis
 

 In
 
 Edwards v. Arizona,
 
 the U.S. Supreme Court held that "it is inconsistent with
 
 Miranda
 
 and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."
 
 Edwards v. Arizona,
 

 451 U.S. 477
 
 , 485,
 
 101 S.Ct. 1880
 
 , 1885,
 
 68 L.Ed.2d 378
 
 , 387 (1981) (discussing
 
 Miranda v. Arizona,
 

 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966) ). In
 
 Edwards,
 
 the police interrogated the petitioner on the evening of January 19 but ceased their questioning when the petitioner invoked his right to counsel.
 

 Id.
 

 at 486-87
 
 ,
 
 101 S.Ct. at 1885-86
 
 ,
 
 68 L.Ed.2d at 387
 
 . The following day, the police returned and advised the petitioner of his
 
 Miranda
 
 rights but did not provide access to counsel.
 

 Id.
 

 at 487
 
 ,
 
 101 S.Ct. at 1886
 
 ,
 
 68 L.Ed.2d at 387-88
 
 . The petitioner "stated that he would talk, but what prompted this action does not appear."
 

 Id.,
 

 451 U.S. at 487
 
 ,
 
 101 S.Ct. at 1886
 
 ,
 
 68 L.Ed.2d at 388
 
 . During this interrogation, the petitioner made a self-incriminating statement.
 

 Id.,
 

 451 U.S. at 487
 
 ,
 
 101 S.Ct. at 1886
 
 ,
 
 68 L.Ed.2d at 388
 
 . The U.S. Supreme Court held that the petitioner's "statement, made without having had access to counsel, did not amount to a valid waiver and hence was inadmissible."
 

 Id.,
 

 451 U.S. at 487
 
 ,
 
 101 S.Ct. at 1886
 
 ,
 
 68 L.Ed.2d at 388
 
 .
 

 In
 
 Davis v. United States,
 
 the U.S. Supreme Court reiterated its holding in
 
 Edwards
 
 that "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation" and addressed the question of "how law enforcement officers should respond when a suspect makes a reference to counsel that is insufficiently clear to invoke the
 
 Edwards
 
 prohibition on further questioning."
 
 Davis v. United States,
 

 512 U.S. 452
 
 , 454,
 
 114 S.Ct. 2350
 
 , 2352,
 
 129 L.Ed.2d 362
 
 , 368 (1994).
 

 The applicability of the rigid prophylactic rule of
 
 Edwards
 
 requires courts to determine whether the accused
 
 actually invoked
 
 his right to counsel. To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry.
 

 *226
 
 Invocation of
 
 *228
 
 the
 
 Miranda
 
 right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect
 
 might
 
 be invoking the right to counsel, our precedents do not require the cessation of questioning.
 

 Rather, the suspect must unambiguously request counsel. As we have observed, a statement either is such an assertion of the right to counsel or it is not. Although a suspect need not speak with the discrimination of an Oxford don, ... he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity,
 
 Edwards
 
 does not require that the officers stop questioning the suspect.
 

 We decline petitioner's invitation to extend
 
 Edwards
 
 and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney.... [I]f a suspect is indecisive in his request for counsel, the officers need not always cease questioning.
 

 ....
 

 Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.... But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.
 

 Id.
 

 at 458-62
 
 ,
 
 114 S.Ct. at 2355-56
 
 ,
 
 129 L.Ed.2d at 371-73
 
 (citations and quotation marks omitted). "The test is an objective one that assesses whether a reasonable officer under the circumstances would have understood the statement to be a request for an attorney."
 
 State v. Hyatt,
 

 355 N.C. 642
 
 , 655,
 
 566 S.E.2d 61
 
 , 70 (2002),
 
 cert. denied,
 

 537 U.S. 1133
 
 ,
 
 123 S.Ct. 916
 
 ,
 
 154 L.Ed.2d 823
 
 (2003). In
 
 Davis
 
 , the U.S Supreme Court held that the petitioner's
 
 *227
 
 remark-"Maybe I should talk to a lawyer"-was not a request for counsel and thus the Naval Investigative Service agents were not required to cease questioning the petitioner.
 
 Id.
 
 at 462,
 
 114 S.Ct. at 2357
 
 ,
 
 129 L.Ed.2d at 373
 
 .
 

 The U.S. Supreme Court had previously explained the difference between invocation and waiver and held that courts must not examine a defendant's statements made
 
 after
 
 his invocation of the right to counsel in determining whether his invocation was ambiguous:
 

 First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.
 

 ....
 

 Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquires, and the two must not be blurred by merging them together.
 

 The importance of keeping the two inquiries distinct is manifest.
 
 Edwards
 
 set forth a "bright-line rule" that
 
 all
 
 questioning must cease after an accused requests counsel. In the absence of such a bright-line prohibition, the authorities through badgering or overreaching-explicit or subtle, deliberate or unintentional-might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance. With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver cannot be established by showing that the accused responded to further police-initiated custodial interrogation.
 

 *229
 
 Using an accused's subsequent responses to cast doubt on the adequacy of the initial request
 
 itself
 
 is even more intolerable. No authority, and no logic, permits the interrogator to proceed on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt
 
 *228
 
 on his initial statement that he wished to speak through an attorney or not at all.
 

 ....
 

 [A]n accused's
 
 postrequest
 
 responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.
 

 Smith v. Illinois,
 

 469 U.S. 91
 
 , 95-100,
 
 105 S.Ct. 490
 
 , 492-95,
 
 83 L.Ed.2d 488
 
 , 493-96 (1984) (
 
 per curiam
 
 ) (citations, quotation marks, brackets, footnote, and ellipsis omitted).
 

 In evaluating whether a defendant's request for counsel is unambiguous, the Seventh Circuit Court of Appeals has held that the questions-"Can I have a lawyer?"-and-"I mean, but can I call [a lawyer] now?"-and-"Can you call my attorney?"-were unambiguous requests for an attorney.
 
 U.S. v. Lee,
 

 413 F.3d 622
 
 , 626 (7th Cir.2005) ;
 
 U.S. v. Wysinger,
 

 683 F.3d 784
 
 , 795-96 (7th Cir.2012) ;
 
 U.S. v. Hunter,
 

 708 F.3d 938
 
 , 943-44 (7th Cir.2013). In
 
 Hunter,
 
 the Court explained that
 

 [i]nstead of using a word like "should" or "might," which would suggest that the defendants were still undecided about whether they wanted a lawyer, all three defendants used the word "can." The defendants' choice of the word "can," by definition, means that they were inquiring into their present ability to be "able to" obtain a lawyer or to "have the opportunity or possibility to" obtain a lawyer. In sum, given the text of the previous statements that our circuit has found sufficient to invoke the right to counsel, the text of [the defendant's] request was sufficient to have put a reasonable officer on notice that [the defendant] was invoking his right to counsel.
 

 Hunter,
 

 708 F.3d at 943-44
 
 (citation omitted). Similarly, in
 
 Sessoms v. Grounds,
 
 the Ninth Circuit Court of Appeals held that the question-"There wouldn't be any possible way that I could have a-a lawyer present while we do this?"-was an unambiguous request for an attorney.
 
 Sessoms v. Grounds,
 

 776 F.3d 615
 
 , 626 (9th Cir.2015),
 
 cert. denied,
 
 - -- U.S. ----,
 
 136 S.Ct. 80
 
 ,
 
 193 L.Ed.2d 207
 
 (2015). In contrast, the Eighth Circuit Court of Appeals held that a state court was not unreasonable in determining that the question-"Could I call my lawyer?"-was not an unambiguous request for counsel.
 
 Dormire v. Wilkinson,
 

 249 F.3d 801
 
 , 805 (8th Cir.2001),
 
 cert. denied,
 

 534 U.S. 962
 
 ,
 
 122 S.Ct. 370
 
 ,
 
 151 L.Ed.2d 281
 
 (2001).
 

 *229
 
 In
 
 Hyatt,
 
 our Supreme Court held that the defendant's statement "to the effect that his
 
 father
 
 wanted him to have a lawyer present during the interrogation was insufficient to constitute an invocation of [the] defendant's Fifth Amendment right to counsel[,]" because the "statement did not unambiguously convey [the]
 
 defendant's
 
 desire to receive the assistance of counsel."
 
 Hyatt,
 

 355 N.C. at 656-57
 
 ,
 
 566 S.E.2d at 71
 
 . The Court also noted that the detective "made no attempt to dissuade [the] defendant from exercising his Fifth Amendment right" but "clarified that [the] defendant, and not his father, must be the one to decide whether to seek the assistance of counsel."
 
 Id.
 
 at 657,
 
 566 S.E.2d at 71
 
 .
 

 Here, during the police interview, after defendant asked to speak to his grandmother, Detective Morse called defendant's grandmother from his phone and then handed his phone to defendant. While on the phone, defendant told his grandmother that he called her to "let [her] know that [he] was alright." From defendant's responses on the phone, it appears that his grandmother asked him if the police had informed him of his right to speak to an attorney. Defendant responded, "An attorney? No, not yet. They didn't give me a chance yet." Defendant then responds, "Alright," as if he is listening to his grandmother's advice. Defendant then looked up at Detective Morse and asked, "Can I speak to an attorney?" Detective Morse responded: "You can call
 
 *230
 
 one, absolutely." Defendant then relayed Detective Morse's answer to his grandmother: "Yeah, they said I could call one." Defendant then told his grandmother that the police had not yet made any charges against him, listened to his grandmother for several more seconds, and then hung up the phone.
 

 Detective Morse then filled out a
 
 Miranda
 
 waiver form and advised defendant of his
 
 Miranda
 
 rights. Defendant refused to sign the form and explained that his grandmother told him not to sign anything. Detective Morse than responded: "Okay. Are you willing to talk to me today?" Defendant responded: "I will. But [my grandmother] said-um-that I need an attorney or a lawyer present." Detective Morse responded: "Okay. Well you're nineteen. You're an adult. Um-that's really your decision whether or not you want to talk to me and kind-of clear your name or-" Defendant then interrupted: "But I didn't do anything, so I'm willing to talk to you." Defendant then orally waived his
 
 Miranda
 
 rights.
 

 Because defendant asked Detective Morse the question-"Can I speak to an attorney?"-during his telephone conversation with his grandmother after she raised the issue of his right to counsel, it is ambiguous whether defendant was conveying his own desire to receive the assistance of counsel or whether he was merely relaying a question from his grandmother to Detective Morse. In the case of the latter, defendant's
 
 *230
 
 question would not constitute an invocation, because a defendant's statement that a family member would like for him to have the assistance of counsel does not "unambiguously convey [the]
 
 defendant's
 
 desire to receive the assistance of counsel."
 
 See
 

 Hyatt,
 

 355 N.C. at 656-57
 
 ,
 
 566 S.E.2d at 71
 
 . Under
 
 Davis,
 
 defendant's ambiguous remark did not require Detective Morse to cease questioning.
 
 Davis,
 

 512 U.S. at 461-62
 
 ,
 
 114 S.Ct. at 2356
 
 ,
 
 129 L.Ed.2d at 373
 
 ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). Defendant's later statement-"But [my grandmother] said-um-that I need an attorney or a lawyer present."-is also not an invocation since it does not "unambiguously convey
 
 defendant's
 
 desire to receive the assistance of counsel."
 
 See
 

 Hyatt,
 

 355 N.C. at 656-57
 
 ,
 
 566 S.E.2d at 71
 
 .
 

 A few minutes later, after Detective Morse advised defendant of his
 
 Miranda
 
 rights, he properly clarified that the decision to invoke the right to counsel was defendant's decision, not his grandmother's.
 
 See
 

 Davis,
 

 512 U.S. at 461
 
 ,
 
 114 S.Ct. at 2356
 
 ,
 
 129 L.Ed.2d at 373
 
 ("Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.");
 
 Hyatt,
 

 355 N.C. at 657
 
 ,
 
 566 S.E.2d at 71
 
 (noting with approval that the detective "clarified that [the] defendant, and not his father, must be the one to decide whether to seek the assistance of counsel").
 

 Defendant's reliance on
 
 U.S. v. Lee
 
 and
 
 U.S. v. Hunter
 
 is misplaced, because the defendants in those cases did not make their requests within the context of a simultaneous conversation with a third-party.
 
 Lee,
 

 413 F.3d at
 
 624 ;
 
 Hunter,
 

 708 F.3d at 940
 
 . Had defendant asked the question-"Can I speak to an attorney?"-before or after his phone conversation,
 
 Lee
 
 and
 
 Hunter
 
 would become much more factually similar. But defendant asked this question
 
 during
 
 the phone conversation with his grandmother after she raised the issue of his right to counsel. The context of defendant's request creates ambiguity concerning whether he was conveying his own desire to receive the assistance of counsel or whether he was merely relaying a question from his grandmother to Detective Morse. We distinguish
 
 Wysinger
 
 and
 
 Sessoms
 
 for the same reason.
 
 See
 

 Wysinger,
 

 683 F.3d at
 
 795-96 ;
 
 Sessoms,
 

 776 F.3d at 626
 
 . Following
 
 Davis
 
 and
 
 Hyatt,
 
 we hold that Detective Morse was not required to cease questioning, because defendant did not unambiguously convey that he desired to receive the assistance of counsel.
 
 See
 

 Davis,
 

 512 U.S. at 461-62
 
 ,
 
 114 S.Ct. at 2356
 
 ,
 
 129 L.Ed.2d at
 
 373 ;
 
 Hyatt,
 

 355 N.C. at 656-57
 
 ,
 
 566 S.E.2d at 71
 
 .
 

 *231
 
 Because defendant orally waived his
 
 Miranda
 
 rights before he made the statements at issue on appeal, we need not address the issue of whether defendant was in custody for purposes of
 
 Miranda.
 
 We therefore hold
 
 *231
 
 that the trial court did not err in denying defendant's motion to suppress.
 

 C. Prejudice
 

 Even assuming
 
 arguendo
 
 that the trial court erred in denying defendant's motion to suppress, we hold that the State has shown that this alleged constitutional error would have been harmless beyond a reasonable doubt.
 
 See
 
 N.C. Gen.Stat. § 15A-1443(b) (2013). We preliminarily note that defendant admitted to killing Mr. Johnson ("the victim") during an inquiry pursuant to
 
 State v. Harbison,
 

 315 N.C. 175
 
 ,
 
 337 S.E.2d 504
 
 (1985),
 
 cert. denied,
 

 476 U.S. 1123
 
 ,
 
 106 S.Ct. 1992
 
 ,
 
 90 L.Ed.2d 672
 
 (1986) ; thus, the central issue at trial was whether defendant acted with premeditation and deliberation. We also note that during the police interview, defendant never confessed to shooting the victim; rather, he said Floyd Creecy shot the victim.
 

 Defendant argues that his following statements and omission during the police interview prejudiced him: (1) defendant's admission that he left the car with a gun before approaching the victim; (2) defendant's admission that he put four bullets in the gun; (3) defendant's admission that he warned Biz Walton immediately before the shooting; and (4) defendant's failure to mention that the victim brandished a knife. Defendant argues that these statements and this omission tended to support the State's theory at trial that defendant shot the victim with premeditation and deliberation rather than defendant's theory at trial that he did not act with premeditation and deliberation and shot the victim only because the victim brandished a knife. Although defendant's statements and omission do tend to support a finding of premeditation and deliberation, any alleged error in their admission would be harmless beyond a reasonable doubt given the overwhelming evidence of defendant's premeditation and deliberation.
 

 All three eyewitnesses, Mr. O'Neal, Ms. Cleveland, and Mr. Walton, testified that defendant confronted the victim, shot the victim, and fired multiple shots.
 
 [2]
 

 See
 

 State v. Taylor,
 

 362 N.C. 514
 
 , 531,
 
 669 S.E.2d 239
 
 , 256 (2008) (holding that a jury may infer premeditation and deliberation from a defendant's conduct, including "entering the site of the murder with a weapon, which indicates the defendant anticipated a
 
 *232
 
 confrontation and was prepared to use deadly force to resolve it" and "firing multiple shots, because some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger") (citation and quotation marks omitted),
 
 cert. denied,
 

 558 U.S. 851
 
 ,
 
 130 S.Ct. 129
 
 ,
 
 175 L.Ed.2d 84
 
 (2009). All three witnesses also testified that the victim never threatened defendant with a knife. Biz Walton testified that defendant continued to shoot at the victim while the victim was running away. The State also proffered a recording of the 911 call in which defendant says, "Watch out, Biz," followed by four gunshots. Dr. Jonathan Privette opined that the victim was shot from less than two feet away. Mr. Walton also testified that defendant had previously told him that he was going to "bang" the victim. In light of this overwhelming evidence of defendant's premeditation and deliberation, we hold that the State has shown that any alleged constitutional error in denying defendant's motion to suppress would have been harmless beyond a reasonable doubt.
 
 See
 
 N.C. Gen.Stat. § 15A-1443(b).
 

 III. Conclusion
 

 For the foregoing reasons, we hold that the trial court committed no error.
 

 NO ERROR.
 

 Judges STEPHENS and McCULLOUGH concur.
 

 [1]
 

 This Court added a footnote here that "Mr. Creecy denied being in a gang, but Mr. Walton testified that Mr. Creecy was [a] 'mentor' to the two younger men in the 'Bounty Hunters.' "
 
 Taylor,
 

 235 N.C.App. 426
 
 ,
 
 763 S.E.2d 928
 
 , slip op. at 2 n. 1.
 

 [2]
 

 Mr. Creecy testified that he heard multiple gunshots but did not see the shooting.